IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MALINDA J. COOPER,**                    Case 5:14 CV 1897

    Plaintiff,                    Judge Benita Pearson

    v.                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                    REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Malinda Cooper filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security insurance ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 1383(c). This matter has been referred to the undersigned for Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated August 27, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be reversed and remanded.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI on July 13, 2011, alleging a disability onset date of October 31, 2008. (Tr. 77, 143). Plaintiff applied for benefits due to Traumatic Brain Injury ("TBI"), vertebral fractures, bipolar disorder, depression, and ADHD. (Tr. 77). Her claim was denied initially (Tr. 77-87) and upon reconsideration (Tr. 89-100). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 119). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on March 5, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 13-20, 26-76). The Appeals Council denied Plaintiff's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff filed the instant action on August 27, 2014. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was born on October 9, 1991, and was 21 years old at the time of the hearing. (Tr. 39). Plaintiff had completed the 12th grade and was pursuing a bachelor's degree at Stark State. (Tr. 39, 43). She completed one semester at the University of Akron and also attended Kent State for one year. (Tr. 43, 45). Plaintiff's educational accommodations allowed her to tape lectures, double test taking time in a non-distracting environment, priority seating, and a note taker; the latter two of which she normally did not use. (Tr. 45, 411). She had a 2.66 GPA and was taking seven credit hours over four days. (Tr. 48, 49). She stated this was her first time not being a full-time student since she started college because she wanted to focus more on the class work. (Tr. 48). She testified she rarely, if ever, missed class. (Tr. 63).

She was employed as a dishwasher at Pizza Hut, she used to wait tables there but she was having trouble operating the computer and getting orders right so they moved her. (Tr. 42, 57). She lived with her mother and stepfather in a house but was not responsible for any chores except for feeding and caring for the dog. (Tr. 40-41, 55). She also visited with her sister, played with her nephew, hung out with her ex-boyfriend and a few others, and met with her best friend when she came back into town. (Tr. 54-55). She also testified she consumed alcohol about twice a month, usually with friends. (Tr. 65). Plaintiff drove about 30 minutes to school but stated she sometimes had problems remembering directions even to the school. (Tr. 50, 59). She was also capable of going to the mall and shopping by herself. (Tr. 55).

Plaintiff took Lamictal, Adderall, and Lunesta but the Adderall caused frequent headaches as often as three times a week. (Tr. 41-42). Although her headaches were bad, she could normally work through them but if not, she had to lie down and put a washcloth on her head. (Tr. 53). She stated she had daily mood shifts relating to her bipolar disorder that caused paranoia, depression, and hyperactivity. (Tr. 50). Plaintiff reported insomnia and more frequent depressive days than manic days. (Tr. 52-54). She also testified to self-inflicted cutting that had happened as recently as a month before the hearing but had been occurring for about five years. (Tr. 60). She stated the urge to cut could sometimes be avoided by making bracelets or going to the gym. (Tr. 62, 220-23).

***Relevant Medical Evidence***

*Physical Evidence*

On October 31, 2008, Plaintiff was struck by a car going approximately 50 mph causing TBI for which she was in a coma for two weeks and had a broken back in two places. (Tr. 267, 307). Following her accident and back surgery, Plaintiff participated in extensive physical therapy, both inpatient and outpatient, and by January 2009, she was ambulating independently with only occasional use of a cane. (Tr. 248). In April 2009 and after, she complained of only minimal pain and discomfort – at most a two out of ten on a pain scale, reported no neuropathic pain in her extremities, was ambulating well, and had returned to full strength and function. (Tr. 249, 250, 251).

In neurology follow-ups with Yolanda Holler, M.D., in 2009 and 2010, she reported memory problems, dysnomia, and difficulty sleeping. (Tr. 260-61). Almost a year after the accident, Plaintiff still had residual impairments in visual perception, visual construction, visual memory, visual working memory, and nonverbal problem-solving. (Tr. 257). And though she

reported performing decently in school, she was often stressed about it and had headaches which could last all day. (Tr. 253-55).

Plaintiff returned to Dr. Holler in September 2012 to discuss management for headaches. (Tr. 337). A few weeks prior, Plaintiff had fallen from a golf cart and was diagnosed with subarachnoid hemorrhage and skull fracture but she denied any new memory loss, worsening headaches, or visual symptoms. (Tr. 337). She described her headache severity as between a four and eight on a ten point scale. (Tr. 337). Plaintiff denied any cognitive changes, lightheadedness, syncope, agitation, depression, or impulsivity. (Tr. 338).

In September 2012 at the time of her visit to the hospital for her head injury, it was noted her "vertebral body and disc space heights are within normal limits." (Tr. 371, 380, 387, 398).

*Mental Evidence*

Plaintiff had a history of ADD, situational anxiety, and suicidal thoughts dating from 2006. (Tr. 227-45). In September 2009, Plaintiff began seeing Scott Pacer, M.D., at Coleman Behavioral Health, where she reported feeling "less depressed, moody, angry, and irritable." (Tr. 303). Plaintiff reported she was also less anxious, had fewer mood swings, was less oppositional, and her interests and self-esteem were intact. (Tr. 303). At this time she noted no suicidal or self-injurious intents. (Tr. 303). Dr. Pacer observed Plaintiff was goal-directed and had linear thought processes, with fair insight and judgment, and fair motivation for treatment. (Tr. 304).

A few months later, Dr. Pacer noted unremarkable and improved mental status findings and stated "mood is good, she has been less depressed, moody, irritable, and angry, less emotional and tearful, [and] she has been less anxious." (Tr. 301). Her mental status exams remained consistent throughout her next few sessions in 2010, where Dr. Pacer noted improvement in attention and concentration, no suicidal or self-injurious intentions, and

4

unremarkable mental status findings except for Plaintiff's reports of difficulty sleeping. (Tr. 294-96, 297, 300).

In September 2010, Dr. Pacer assigned a global assessment of functioning ("GAF") score of 60 to Plaintiff.[1] (Tr. 293). He reported no suicidal or self-injurious ideations, no impairment of memory or concentration, rated her of average intelligence with logical thought process, cooperative behavior, and noted she is social with friends. (Tr. 289-91).

Dr. Pacer's notes reflected no changes in Plaintiff's mental status or GAF score in either January or May 2011. (Tr. 272-76, 277-81, 283-87). By January 2011, she was living at home without incident, was completing chores, attending to her personal hygiene, and maintaining her good grades – a 3.9 GPA. (Tr. 272, 277, 283). Plaintiff returned to Dr. Pacer in August and November 2011, where she reported stable mood and medication compliance and that she was now living on her own near Stark State. (Tr. 314, 320). Once again the mental status evaluation noted no suicidal or self-injurious ideations, no impairment of memory or concentration, rated her of average intelligence with logical thought process, and cooperative behavior. (Tr. 314-18, 321-24).

Again over three appointments in 2012, Dr. Pacer reported no changes to Plaintiff's mental status exams, her GAF score remained consistent at 60, and Plaintiff reported no worsening of symptoms or changes in behavior except that by September 2012 she had moved back home. (Tr. 340-55). While back home she was completing her chores but was only "sort of" getting along with her mom. (Tr. 340).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32-33 (4th ed., Text Rev. 2000) (DSM-IV-TR). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

In November 2012, Plaintiff reported the Adderall was effective for her attention and concentration difficulties but she was feeling paranoid and having mood swings but denied losing her temper. (Tr. 357). These changes caused Dr. Pacer to reduce Plaintiff's GAF score to 52 but he did not alter his observations in his mental status exam. (Tr. 355-61). A month later she met with Dr. Pacer again and reported she was doing better although she was stressed about school and family issues. (Tr. 364). Once again, Dr. Pacer noted no suicidal or self-injurious ideations, no impairment of memory or concentration, logical thought process, and cooperative behavior. (Tr. 363-64). At this session he increased her GAF score to 55. (Tr. 367).

*Opinion Evidence*

In February 2012, Dr. Pacer opined Plaintiff would have poor to no ability to understand and remember short, simple instructions or detailed instructions, maintain attention for a two hour segment, maintain punctuality and attendance, work in coordination with others without distraction, set goals independently, travel to unfamiliar places, or respond appropriately to stress. (Tr. 333-34). However, Dr. Pacer also rated Plaintiff fair to very good in a number of other categories including sustaining a routine without supervision, making simple work-related decisions, getting along with co-workers, supervisors, and the public, adhering to hygiene standards, dealing with stress of semi-skilled or unskilled work, performing at a consistent pace without unreasonable interruptions, and carrying out short, simple instructions. (Tr. 33-34). He also concluded she would be absent about twice a month but would also be able to manage her own benefits if awarded. (Tr. 335). Dr. Pacer opined her poor short term memory, mood swings, and anxiety were the basis of his limitations. (Tr. 334).

*Consultative Examination*

On October 12, 2011, Plaintiff was seen for a consultative physical examination by Steven Rodgers, M.D., where she reported short-term memory loss, slow information processing, headaches, and increased sensitivity to stress. (Tr. 307). She also reported back pain at a six out of ten on a pain scale, difficulty standing for more than ten minutes, or walking more than one block. (Tr. 307).  Dr. Rodgers observed "no significant difficulty maneuvering…including moving from sitting to standing position, or getting on or off the examination table." (Tr. 308). Although Plaintiff was able to heel and toe walk, Dr. Rodgers remarked her gait was somewhat slow and there was slight left-side instability but muscle testing revealed normal strength and range of motion in all areas. (Tr. 308, 310-13). Dr. Rodger's opined Plaintiff's ability to stand and walk were limited to ten minutes per hour, she should not work at heights, and she had no limitations regarding her vision, hearing, speech, or use of her hands. (Tr. 309).

*State Agency Reviewers*

In August 2011, Katherine Fernandez, Psy.D., found Plaintiff had mild restrictions in activities of daily living and maintaining concentration, persistence, and pace, and no restrictions in maintaining social functioning. (Tr. 82). Dr. Fernandez noted Plaintiff was maintaining a 3.9 GPA despite the need for repeated instructions, could care for herself and a dog, drove to school, grocery shopped, and interacted with family, friends, and peers at school. (Tr. 82). Dmitri Teague, M.D., opined in November 2011 that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or sit for six hours in an eight hour work day, occasionally climb ramps or stairs but never ladders, ropes, or scaffolds, can frequently balance, kneel, or crawl, occasionally stoop, and avoid all exposures to hazards. (Tr. 84-85).

On reconsideration, Karla Voyten, Ph.D., and William Bolz, M.D., concurred with the previous findings and limitations of Drs. Fernandez and Teague. (Tr. 94-97).

### ALJ Decision

In April 2013, the ALJ found Plaintiff had the severe impairments of degenerative disc disease, TBI, ADHD, and mood disorder; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 15). The ALJ then found Plaintiff had the RFC to perform a limited range of light work except she could not climb ladders, ropes, or scaffolds, could only occasionally climb ramps and stairs, and could not work around hazards. (Tr. 16). Further, she was limited to simple, routine tasks that did not involve arbitration, negotiation, confrontation, directing the work or others or being responsible for the safety or welfare of others, and could not have strict production quotas, or perform piece rate or assembly line work. (Tr. 16).

Based on the VE testimony, the ALJ found Plaintiff could perform work as a Fast Food Worker, Cashier II, or Housekeeping Cleaner. (Tr. 20).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r*

*of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age,

9

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

In her sole assignment of error, Plaintiff argues the ALJ failed to give appropriate weight to her treating physician Dr. Pacer. (Doc. 12, at 1).

***Treating Physician Rule***

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. An ongoing treatment relationship will exist when "medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice". § 404.1502.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1)

medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The ALJ gave Dr. Pacer's opinion little weight because it was not consistent with the other medical evidence and was contradicted by Plaintiff's ability to work and attend college. (Tr. 19). These reasons are not sufficiently specific to make clear to a subsequent reviewer the reasons for the weight given to Dr. Pacer's opinion. *See Cole v. Astrue,* 661 F.3d 931, 937 (6th

Cir. 2011). Throughout the ALJ's opinion he discusses both medical evidence and activities of daily living that could contradict a finding of disability, yet he does not particularly cite to or explain how this evidence affects the weight of Dr. Pacer's opinion as required by the good reasons rule.

If the Court were to undertake a post-hoc review of the medical record, there is certainly evidence to support the ALJ's RFC decision, such as consistent GAF scores between 50 and 60, consistently stable mood, logical thoughts, effectiveness of medication, and almost two years of Dr. Pacer's treatment notes which report no impairment in attention, concentration, or memory. (*See* Tr. 272-81, 283-87, 289-91, 293-300, 314-18, 321-24, 340-55, 357, 363-64, 367). Further, there are activities of daily living which demonstrate that Plaintiff is capable of living on her own, caring for herself, and balancing work, school, and a social life. (*See* Tr. 272, 277, 283, 289-91, 314, 320, 340-55). However, the ALJ did not cite to this evidence in his discussion of Dr. Pacer's opinion, let alone discuss it. Nor did he explain how the reasons he did give − ability to work ten hours a week and go to school part-time−contradicted Dr. Pacer's conclusions. *See Rogers,* 486 F.3d at 243 (finding that not only must an ALJ identify the reasons for discounting an opinion, she must "explain[ ] precisely how those reasons affected the weight".).

Thus, "even where the conclusion of the ALJ may be justified based upon the record" remand is required when the ALJ failed to follow the administrative regulations requiring good reasons to be given. *See Wilson,* 378 F.3d at 546; *Blakley v Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).   The undersigned recommends remand to allow the ALJ to more fully explain the weight given to Dr. Pacer's opinion.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Commissioner's decision be reversed and remanded.


     s/James R. Knepp II         
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).